# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| EVANGELINE B. HARDIN, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-1343-B (BH) |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed December 1, 2010 (doc. 12), and *Defendant's Motion for Summary Judgment*, filed February 3, 2011 (doc. 16). Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **DENIED**, Defendant's motion should be **GRANTED** and the final decision of the Commissioner should be **AFFIRMED**.

## I. BACKGROUND[1]

### A. Procedural History

Evangeline Brenae Hardin ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. On

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

March 9, 2009, Plaintiff applied for disability insurance benefits, alleging disability since March 3, 2008, due to a psychological condition. (R. at 146.) On March 23, 2009, she applied for supplemental security income based on the same condition. (R. at 148.) Plaintiff's applications were denied initially and upon reconsideration. (R. at 67, 77.) She timely requested a hearing before an Administrative Law Judge ("ALJ") and personally appeared and testified at a hearing held on December 22, 2009. (R. at 25-48, 83.) On March 26, 2010, the ALJ issued a decision finding Plaintiff not disabled. (R. at 10-17.) On May 21, 2010, the Appeals Council denied her request for review, and the ALJ's decision became the Commissioner's final decision. (R. at 1-3, 5.) On July 9, 2010, Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

**B.    Factual History**

    **1.    Age, Education, and Work Experience**

Plaintiff was born on December 31, 1982; she was 25 years old on her alleged onset date and was 26 at the time of her application. (R. at 27, 136, 146.) She has a high school diploma and has past relevant work as a hospital cleaner, cashier, and fast food server. (R. at 29-31, 189-196.)

    **2.    Medical Evidence**

Plaintiff's relevant medical history began on June 11, 2005, when she visited the emergency room at Methodist Charlton Medical Center ("Methodist ER") complaining of seizures and abdominal pain. (R. at 351-56.) She returned to the hospital twice the following month complaining of the same symptoms. (R. at 326-50, 394-402.) Dr. He Yong, her examining physician, increased her seizure medication and instructed her to undergo further neurological testing. (R. at 350.) On July 23, Christine C. Page, M.D., performed an MRI of Plaintiff's brain and found that there was "no mass lesion, mass effect, edema, or hemorrhage" and "no signal abnormality on imaging

sequence." (R. at 388.) Between July 26 and October 4, 2005, Plaintiff underwent additional examinations, including a 48 hour EEG study measuring her brain activity; the study was deemed normal. (R. at 417-65.)

On March 10, 2006 Plaintiff visited Methodist ER complaining of seizures and a headache. (R. at 622-27.) John H. Gray, M.D., performed a CT scan of her brain and found no significant intra-cranial abnormality. (*Id.*) His impression was a normal unenhanced head CT. (*Id.*) On October 25, 2008, doctors at Methodist ER performed another CT scan of Plaintiff's brain that yielded the same result. (R. at 563.) Over the next couple of years, Plaintiff made numerous visits to Methodist ER and Parkland Health Hospital Emergency Center with complaints of multiple ailments, including seizures, anxiety, and depression. (R. at 417-65.)

On January 10, 2009, Plaintiff returned to Methodist ER with complaints of seizures. (R. at 548.) Her examining physician, A. Gaidarski, M.D., noted that she was experiencing "all over" muscle spasms of moderate severity but had no chest pain or breathing difficulty, no dizziness, headache, or difficulty speaking, and no suicidal thoughts, anxiety, or depression. (*Id.*) He also noted that she had been out of Dilantin, her seizure medication, for two months. (*Id.*) He ordered various blood tests and prescribed medication for her seizures and muscle spasms. (R. at 550-55.)

On January 23, 2009, Plaintiff visited Dallas Metrocare for a "medication check". (R. at 522.) She reported depression and anxiety, and stated that she saw "shadows of people" three to five times a day, but she denied any hallucinations. (*Id.*) She told the examining clinician that she had used marijuana the day before and that she used it every time she felt depressed. (*Id.*) The clinician noted that Plaintiff had poor memory and concentration. (*Id.*)

Plaintiff returned to Dallas Metrocare on January 27, 2009, for a diagnostic evaluation by

Ellen Garrison, a qualified mental health professional ("QMHP"). (R. at 515-18.) Plaintiff reported that she was not sleeping, felt restless and isolated, had some suicidal thoughts, and had been feeling sad and depressed for over a year. (R. at 515.) She also reported paranoia and thoughts of people watching and following her. (*Id.*) Garrison diagnosed her with major depressive disorder with psychotic features and recommended that she be educated on her illness and its symptoms, as well as on skills needed for coping, problem solving, and stress management. (R. at 516-17.)

On March 2, 2009, Plaintiff returned to Dallas Metrocare and reported continued feelings of depression, irritability, and tiredness with low energy levels. (R. at 538.) Garrison identified her barriers as lack of concentration and symptoms of depression and noted that she had "no needs unmet at [that] time." (*Id.*) She gave Plaintiff some information about community agencies that could provide her additional support. (*Id.*)

On May 13, 2009, Deborah Gleaves, Ph.D., completed a consultative examination report for Plaintiff. (R. at 685-90.) Plaintiff reported that she began feeling depressed in January of 2009, and that she was "just feeling stressed out by life and the fact that she continued to have seizures and this interfered with her ability to work consistently." (R. at 686.) With respect to her daily activities, she took care of her young children, bathed and fed them, and changed their diapers." (R. at 687.) She was able to use the microwave oven, cook simple meals, "use a telephone, use a cell phone, use the computer, tell time, and count money." (*Id.*) Dr. Gleaves noted that during the evaluation, Plaintiff "had difficulty with tasks that required attention, concentration, and short term memory." (*Id.*) She also had rapid mood swings "but [had] no history of manic episodes." (R. at 689.) Dr.

Gleaves diagnosed Plaintiff with bipolar disorder, assigned her a GAF score of 40,[2] and noted that prognosis was guarded due to her substance abuse, that without treatment her condition would worsen, and that in her current condition she would have difficulty making appropriate occupational, social, and personal adjustments. (*Id.*)

On June 4, 2009, Dr. Robert White, a state agency medical consultant, reviewed Plaintiff's medical evidence, completed a Psychiatric Review Technique form, and assessed Plaintiff's mental Residual Functional Capacity ("RFC"). (R. at 691-708.) Dr. White diagnosed Plaintiff with bipolar disorder and substance addiction disorder. (R. at 691, 694.) In rating her functional limitations, Dr. White noted that Plaintiff had: mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence or pace; and one or two extended episodes of decompensation. (R. at 701.) He assessed Plaintiff a GAF score of 40 and noted that she showed signs of depression, but that she was fully oriented, her insight and judgment were within normal levels, and her memory appeared to be fair. (R. at 703.) He stated that overall, the evidence did not reflect a degree of mental or emotional symptoms indicating that Plaintiff's work-related activities would be significantly or consistently compromised. (*Id.*)

With respect to Plaintiff's Mental RFC, Dr. White noted that her ability to understand and remember locations, procedures, and "very short and simple instructions" was not significantly limited, while her ability to understand and remember "detailed instructions" was markedly limited. (R. at 705.) Similarly, her ability to carry out very short and simple instructions was not significantly limited, but her ability to carry out detailed instructions was markedly limited. (*Id.*)

---

[2] A GAF score of 31-40 indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

Dr. White also found that Plaintiff was "moderately limited" in 6 mental activities but was not significantly limited in 12 activities, including "the ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. at 706.) Dr. White concluded that Plaintiff could understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting. (R. at 707.)

On June 5, 2009, Dr. Yvonne Post, D.O., another state agency medical consultant, reviewed Plaintiff's medical evidence. (R. at 709.) She noted that Plaintiff's alleged limitations were not "wholly supported" by the evidence of record. (*Id.*) On August 17, 2009, two other state agency medical consultants, Margaret Meyer, M.D., and Kelvin Samaratunga, M.D., reviewed Plaintiff's medical evidence. (R. at 729-730.) Dr. Meyer diagnosed Plaintiff with bipolar disorder and substance abuse and confirmed Dr. White's assessment. (R. at 729.) Dr. Samaratunga noted that Plaintiff continued to use marijuana and confirmed Dr. Post's evaluation. (R. at 730.)

On June 29, 2009, Plaintiff returned to Dallas Metrocare and visited with Natasha Simmons, an advanced practice nurse. (R. at 726.) Plaintiff reported that she was not sleeping at all and that she had crying spells, suicidal thoughts, and even thought of cutting her wrists, but that she had no plan or intent of doing so. (R. at 726.) She also stated that she was out of her medications because her boyfriend had taken them from her. (*Id.*) Simmons noted that Plaintiff interacted well with her children and had fluent and coherent speech, logical and goal oriented thoughts, and normal memory and concentration. (R. at 726-27.) Simmons discussed hospitalization with Plaintiff, but she "definitely" did not want that. (R. at 727.)

On September 21, 2009, Plaintiff returned to Dallas Metrocare for a follow-up visit. (R. at 815.) During therapy, Plaintiff stated that she had used marijuana for 10 years and was not ready to stop because it was the only thing that calmed her nerves. (*Id.*) The therapist explained to Plaintiff the importance discontinuing marijuana use for recovery but got the impression that Plaintiff was not interested in recovery at the time. (*Id.*) The therapist gave her information about substance abuse assistance programs and noted that her over-all recovery progress was poor. (*Id.*)

On December 3, 2009, during Plaintiff's last visit to Dallas Metrocare on file, Simmons performed another evaluation of Plaintiff and assessed her a GAF score of 43. (R. at 818.) Plaintiff reported that she continued to have difficulty sleeping and was feeling sad once a month. (R. at 825.) Simmons noted that Plaintiff's attention was impaired, but she was adequately groomed and cooperative, her mood was congruent, her memory was "intact," her speech was normal, her insight and judgment were "fair," and she showed no signs of psychotic features. (*Id.*) She prescribed Plaintiff a sleep medication and recommended an additional three-month treatment that included group and individual psycho-social rehabilitation. (R. at 826-28.)

### 3. Hearing Testimony

On December 22, 2009, Plaintiff, her non-attorney representative, and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 24-48.)

#### *a. Plaintiff's Testimony*

Plaintiff testified that she was not married, had a high school diploma, and was living with her aunt's family, her boyfriend, and her two children. (R. at 27-28.) She had not worked since March 3, 2008, and her most recent jobs included carhopping at Sonic and housekeeping at various nursing homes. (R. at 29-32.) She had worked at Sonic on several occasions but left because she

was sick, had seizures and crying spells, and "really couldn't handle the noise and the people there." (R. at 31.) She left her last job at Sonic because she did not have any childcare. (*Id.*) She left her employment at a nursing home in March of 2008 because of her seizures and her bipolar disorder, and because her screaming and crying caused her difficulties with the people there. (R. at 29, 40.)

She testified that she suffered from muscle spasms, had difficulty sleeping, and had recently experienced rapid, unexplained weight loss. (R. at 34-35.) She had been using marijuana daily, and nobody had warned her about its adverse effects on her health. (R. at 36-37.) She smoked marijuana because it calmed her when she felt depressed. (R. at 40.) She did not have seizures when she was on her seizure medication, but the medication for her bipolar disorder had not suppressed all her symptoms because she continued to have crying spells, and she couldn't stand being around people, not even her own children. (R. at 36, 38.) She feared that people watched her and talked about her and had hallucinations of people chasing her. (R. at 39.)

With respect to her daily activities, Plaintiff testified that she was able to take care of her personal bathing, grooming, and dressing, and was sometimes able to do that for her children. (R. at 33.) Her sister babysat her children about four days a week because she could not "stand the noise." (*Id.*) She sometimes helped with household chores such as grocery shopping, cooking, doing dishes, cleaning, vacuuming, and doing laundry if it was not too heavy. (R. at 34.) She often didn't complete her tasks because she struggled with concentration due to her lack of sleep. (R. at 41.) Before her disability, she would go to church every Sunday and was even part of the choir, but she was only attending church twice a month at the time of the hearing because she couldn't stand the noise or the people. (R. at 41-42.)

### *b. Vocational Expert's Testimony*

The VE testified that he had found six job titles in reviewing Plaintiff's employment history, but given her present circumstances, she could only perform two. (R. at 43.) One was a car hop, which was light, unskilled, and with a specific vocational preparation level ("SVP") of 2. (*Id.*) The other was a hospital cleaner or housekeeper, which was of medium exertion, unskilled, and with an SVP level of 2. (*Id.*)

The ALJ asked the VE to opine whether a hypothetical individual of the same age, education, and work experience as Plaintiff could perform her past relevant work if the individual was limited to simple work with incidental interaction with the public and co-workers, and no involvement with ropes, ladders, scaffolds, unprotected heights, dangerous machinery, open flames, or bodies of water. (R. at 44.) The VE opined that the hypothetical individual could perform Plaintiff's past relevant work as a hospital cleaner, and could perform other work in the economy such as the jobs of a cleaner/housekeeper (light, unskilled, SVP 2, DOT[3] # 323.687-014), marker (light, unskilled, SVP 2, DOT # 209.587-034), and a ticketer (light, unskilled, SVP 2, DOT # 229.587-018). (*Id.*) The VE testified that his testimony was consistent with the DOT. (R. at 45.)

On cross-examination by Plaintiff's representative, the VE testified that a person who is routinely unable to finish tasks due to low concentration or interest would be unable to maintain employment. (*Id.*) He opined that Plaintiff's employment history, which included 23 different employers in seven years, was "not atypical of someone with mental health problems," but pointed out that while Plaintiff had a smattering of jobs in between, she also had some jobs of a longer duration. (R. at 46-47.)

---

[3] DOT stands for Dictionary of Occupational Titles.

### C. ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion on March 26, 2010. (R. at 7-17.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 3, 2008, the alleged onset date of her disability. (R. at 12.) At step two, she found that Plaintiff had a severe combination of impairments including seizure disorder, affective mood disorder with psychotic features, and polysubstance abuse. (*Id.*) At step three, she found that Plaintiff did not have an impairment or a combination of impairments that met or medically equaled a listed impairment. (R. at 13.) The ALJ then determined that Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: she was limited to simple work in which interaction with the public and co-workers was incidental; she could never climb ladders, ropes, or scaffolds; and she could not perform work that involved unprotected heights, dangerous machinery, open flames or unprotected bodies of water. (*Id.*) In making this finding, the ALJ determined that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the objective medical evidence in the record. (R. at 15.) The ALJ found that given her age, education, work experience, and residual functional capacity, Plaintiff could perform her past work as a hospital cleaner, and was not disabled since March 3, 2008, through the date of her decision. (R. at 17.)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether it is supported by substantial evidence and whether the Commissioner applied the proper legal

standard in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); *see also* 42 U.S.C.A. § 405(g) (providing that "[t]he findings of the Commissioner... as to any fact, if supported by substantial evidence, shall be conclusive...") (West Supp. 2010). Substantial evidence is "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

In applying the substantial evidence standard, the Court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A no substantial evidence finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

Additionally, this Court reviews decisions under the Social Security Disability and Supplemental Security Income programs applying the same legal standard. *See Johnson*, 864 F.2d at 343 n.1. Likewise, the relevant case law and regulations governing a disability determination under a claim for disability insurance benefits are the same as those governing a claim for supplemental security income. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Therefore, this Court may rely on precedent in either area in reviewing an ALJ's decision. *See id.*

### 2. Disability Determination

To be eligible for benefits, a claimant must prove that she has a disability as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64. Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(A) (West Supp. 2010).

The Commissioner utilizes a five-step sequential inquiry to determine whether a claimant is disabled and thereby entitled to monthly benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.
2. An individual who does not have a "severe impairment" will not be found to be disabled.
3. An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.
5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Greenspan*, 38 F.3d at 236; *see also* 20 C.F.R. § 404.1520(b)–(f) (2009) (prescribing the five-step sequential disability evaluation process).

Under the first four steps, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. If the claimant proves a disability under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. To meet this burden, the Commissioner may resort to the Medical-Vocational Guidelines of the Federal Regulations or utilize vocational expert testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). But if at any point in the analysis the Commissioner finds that the claimant is not disabled the process terminates and benefits must be denied. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.     Issues for Review**

Plaintiff presents two issues for review:

(1)     The ALJ failed to weigh the opinions of Robert B. White, Ph.D., the State Agency Psychological Consultant, using the appropriate legal standard; and

(2)     The record contains no other expert medical opinion regarding Plaintiff's mental capabilities to perform work activities, leaving the ALJ's RFC finding wholly unsupported by substantial evidence.

(Pl. Br. at 1.)

**C.     Issue One: Dr. White's Opinion**

Plaintiff contends that in assessing her mental RFC, the ALJ failed to assign proper weight to Dr. White's opinion that she had a markedly limited ability to understand, remember, and execute detailed instructions. (Pl. Br. at 6-11.) She argues that the ALJ rejected the opinion without providing any explanation and without considering the six factors outlined in 20 C.F.R. § 404.1527(d). (*Id.*) She asserts that had the ALJ adopted the limitation identified by Dr. White, there would be no jobs for her to perform because all the jobs identified by the VE require a reasoning level of 2, i.e., an ability to carry out detailed instructions. (*Id.* at 12-13.)

State agency medical or psychological consultants ("SAMC") such as Dr. White are considered experts in the Social Security disability program and their opinions may be entitled to great weight if they are supported by the evidence. *Rawls v. Astrue*, 2011 WL 725279, at *11 (N.D. Tex. Mar. 2, 2011). Even though an ALJ is responsible for assessing an individual's RFC, she must consider and evaluate any assessment of the individual's RFC by an SAMC. *See* Social Security Ruling ("SSR") 96-6p,1996 WL 374180, at *4 (S.S.A. July 2, 1996). She must treat the SAMC's opinion as a medical opinion from a non-examining source and evaluate it under the factors outlined in 20 C.F.R. § 404.1527(d). *Id.* She is not required to explicitly address or discuss each factor,

- 13 -

however, because such a detailed analysis is necessary only when the ALJ rejects a treating source's opinion. *See Newton v. Apfel*, 209 F. 3d 448, 456-58 (5th Cir. 2000). Moreover, where substantial evidence supports the ALJ's decision, the failure to consider every single opinion or statement of a SAMC may constitute harmless error. *See Alejandro v. Banhart*, 291 F. Supp. 2d 497, 516-17 (S. D. Tex. 2003) (the ALJ's failure to consider or document a state agency consultant's opinion is reversible error only if substantial evidence does not support the ALJ's decision).

Here, the ALJ did not explicitly refer to Dr. White's RFC assessments by name, but she explained that she had considered the "opinion evidence" in the record and incorporated it into her RFC findings. (R. at 14-15.) She further explained that less weight would be given to the opinions of SAMCs because these professionals were not treating physicians. (R. at 16.) She therefore did not address or reject Dr. White's findings in "only a generic way." In fact, she incorporated some of his assessments. For example, while she rejected his GAF score finding of 40 as being inconsistent with the evidence, she adopted his discussion that treatment notes described Plaintiff as fully oriented with normal judgment and insight. (R. at 15.)

The ALJ, however, did not adopt Dr. White's finding that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions, and that she had the ability to understand, remember, and carry out only simple instructions. Her restriction of Plaintiff to simple work did not accommodate these limitations because simple work is not always synonymous with unskilled work, and therefore the basic mental demands of simple work may include more than the ability to understand, carry out, and remember simple instructions.[4] *See e.g.*, *Reynaud v. Astrue*,

---

[4] SSR 85-15 states that among the basic mental demands of unskilled work is the ability to "understand, carry out, and remember simple instructions...." SSR 85-15, 1985 WL 56857, at *4.

226 F. App'x. 401, 404 (5th Cir. 2007) (substantial evidence supported ALJ's hypothetical that claimant was limited to "simple unskilled work with no detailed instructions"); *Hiller v. Soc. Sec. Admin.*, 486 F.3d 359, 366–67 (8th Cir. 2007) (ALJ did not err in accepting VE's testimony that claimant who was limited to "simple, concrete work, either unskilled or semiskilled" could perform past relevant work); *Savage v. Barnhart*, 372 F. Supp. 2d 922, 931 (S.D. Tex. 2005) (substantial evidence existed that claimant "was able to perform simple unskilled work as well as semiskilled work"). Moreover, her finding that Plaintiff could perform her past work as a hospital cleaner necessarily rejected Dr. White's limitations because the job, according to the DOT, required a reasoning level of 2, and therefore required the ability to understand and execute detailed but involved instructions.[5] *See* DOT, § 323.687-010, 1991 WL 672782. In short, the ALJ implicitly rejected Dr. White's findings that Plaintiff could understand, remember, and carry out only simple instructions and not detailed instructions.

Substantial evidence, however, supports the ALJ's implicit rejection of Dr. White's opinion. In her narrative discussion, she gave more weight to more recent treatment records from Dallas Metrocare noting that Plaintiff was fully oriented and had normal judgment and insight, logical and goal-oriented thoughts, and normal memory and concentration. (R. at 15-16, 809.) Other medical records generated before and after Dr. White rendered his opinion also noted that Plaintiff was coherent, logical, and goal-directed, and had normal memory and concentration, and organized thought processes. (R. at 519, 729, 825.) In fact, Dr. White himself noted that the records indicated

---

[5] The information listed in the DOT is meaningful and the reasoning development levels that it identifies should not be ignored or disregarded. *Gaspard v. Comm'r of Soc. Sec.*, 609 F. Supp. 2d 607, 617 (E.D. Tex. 2009). While the SVP levels in the DOT indicate the skill level of an occupation, the reasoning development levels identify the reasoning capabilities that the occupation requires for its execution. *Otte v. Comm'r of Soc. Sec.*, 2010 WL 4363400, at *7 (N.D. Tex. Oct. 18, 2010).

Plaintiff had normal insight and judgment, a fair memory, and no overt psychosis. (R. at 703.) While the record also contained more restricting GAF scores of 40 and 43 assessed by Dr. White, a consultative examiner, and an advanced practice nurse, the ALJ rejected these scores as inconsistent with the treatment notes described above. (*Id.*) It was entirely within her purview to resolve any conflicts in the evidence because such conflicts are for the Commissioner, and not the courts, to resolve. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Moreover, she was "free to reject the opinion of any physician when the evidence support[ed] a contrary conclusion." *Newton*, 209 F.3d at 455. Because substantial evidence supports the ALJ's implicit rejection of Dr. White's opinion, remand is not required on this issue.[6]

## D. <u>Issue Two: Substantial Evidence</u>

Plaintiff next argues that the ALJ's mental RFC finding is unsupported by substantial evidence because she ignored the only available expert assessment of Plaintiff's abilities to perform mental work activities and crafted her RFC from her treatment records alone. (Pl. Br. at 13.) She asserts that in this Circuit, evidence supporting an ALJ's RFC finding "cannot be exclusively medical, but must focus precisely on the effects that medical impairments have on an applicant's ability to work." (*Id.* at 14-15.)

The claimant's RFC assessment is a determination of the most she can still do despite her physical and mental limitations. *Perez v. Barnhart*, 415 F.3d 457, 462 (5th Cir. 2005). The ALJ is

---

[6] The parties dispute whether the VE's testimony that a person with simple work can perform the jobs of a cleaner/hospital, cleaner/housekeeping, marker, and ticketer, conflicts with the DOT's reasoning requirement for the jobs. Even though the jobs identified by the VE require a reasoning level of 2 and therefore require a person to understand, remember, and carry out detailed but uninvolved instructions, simple work can include skilled and unskilled work and therefore may require more than the ability to understand, carry out, and remember simple instructions. There is no apparent or implicit conflict between the DOT's reasoning requirement for the jobs and the VE's testimony that a person limited to simple work could perform those jobs.

responsible for assessing a claimant's RFC based on all of the relevant evidence in the record. *See id.*; 20 C.F.R. § 404.1546(c). Although the ALJ should obtain a medical source statement describing the types of work that the claimant can still perform, the absence of such a record, in itself, does not make the record incomplete. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). If substantial evidence in the record supports an ALJ's determination of a claimant's RFC, there is no reversible error. *See id; Gutierrez v. Barnhart*, 2005 WL 1994289, at *7 (5th Cir. Aug. 19, 2005).

Here, at the fourth step of the evaluation process, "after careful consideration of the entire record," the ALJ determined that Plaintiff retained the mental RFC to perform a full range of work at all exertional levels but was limited to "simple work in which interaction with the public and coworkers is incidental." (R. at 14.) She afforded less weight to the opinions of the state agency medical consultants, including Dr. White's, based on two reasons: medical evidence received after they completed their assessments led to different conclusions, and some of their findings, such as Plaintiff's GAF score, were inconsistent with the medical notes in the evidence. (R. at 15-16.) On several occasions, treating physicians observed Plaintiff's memory and concentration to be normal and intact, and her thought processes to be logical and goal-oriented. (*See e.g.* R. at 519, 526, 727, 809, 821, 825.) Dr. White and Dr. Meyer, two SAMCs, also noted that Plaintiff's treating physicians had found her to be coherent, logical and goal-oriented, and with normal memory and concentration. (R. at 703, 729.) While it is true that the evidence the ALJ relies on for her RFC determination must concern the "effects" of the claimant's impairments on her ability to work, the ALJ in this case relied on such evidence. *See Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); *Browning v. Barnhart*, 2003 WL 1831112, at *8 (E.D. Tex. Feb. 27, 2003) (citing *id.*). The records cited above involved medical source opinions and observations with respect to the effects of her

impairments on her memory, concentration, and thought process, even if the records did not specifically identify them as such.

In making her RFC finding, the ALJ also stated that Plaintiff's failure to take the medicine as prescribed and to stop using marijuana as instructed detracted from her credibility. (R. at 16.) She stated that while Plaintiff claimed to have left her prior work because of her seizures, her treatment notes reflected that her seizure episodes were a direct result of her non-compliance with her medication. (R. at 15.) She also stated that Plaintiff's statements about her depression were not fully credible because her psychological treatment at Dallas Metrocare was notably routine or conservative in nature. (R. at 16.) She pointed out that Plaintiff's stated reason for leaving one of her recent employments was not related to her alleged disability, but rather, her difficulties finding appropriate childcare. (R. at 17.) All of the evidence described above constitutes substantial evidence supporting the ALJ's determination of Plaintiff's mental RFC.

### III.  RECOMMENDATION

Plaintiff's motion for summary judgment should be **DENIED**, Defendant's motion for summary judgment should be **GRANTED**, and the decision of the Commissioner should be wholly **AFFIRMED**.

**SO RECOMMENDED**, on this 31st day of March, 2011.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

   A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

                          /s/ Irma Carrillo Ramirez
                          IRMA CARRILLO RAMIREZ
                          UNITED STATES MAGISTRATE JUDGE